# In the United States Court of Federal Claims

No. 23-416

(Filed: November 8, 2023)

|  |  |
|---|---|
| **LENNAR CORPORATION & HPS DEVELOPMENT CO., LP,** | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| **UNITED STATES,** | ) ) ) |
| Defendant. | ) ) ) |

Geoffrey H. Yost, O'Melveny & Myers LLP, San Francisco, CA, for plaintiffs Lennar Corporation and HPS Development.  With him on the pleadings and briefs were Daniel M. Petrocelli, David Marroso, and Madhu Pocha, of Counsel, O'Melveny & Myers LLP, Los Angeles, CA.

Amanda L. Tantum, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for the United States.  With her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

Lennar Corporation ("Lennar Corp.") and HPS Development Co., LP, ("HPS Development") a subsidiary of Lennar Corp., have filed suit against defendant, the United States ("the government"), Compl. ¶ 1, ECF No. 1, alleging that the government improperly denied their request for indemnification under Section 330 of the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, Div. A, Title III, § 330, 106 Stat. 2371 (Oct. 23, 1992), *amended by* Pub. L. No. 103-160, Div. A, Title X, § 1002, l07 Stat. 1745 (Nov. 30, 1993) ("Section 330"); Compl. ¶¶ 11-12.  They seek judgment in the amount of $119,095.92, any additional amount provided for under Section 330, and interest on the judgment.  Compl. ¶¶ 69-71.  On June 22, 2023, the government moved to dismiss plaintiffs' complaint.  Def.'s Mot. to Dismiss, ECF No. 9.  In its motion to dismiss, the government contends that this court lacks subject-matter jurisdiction over plaintiffs' suit and that plaintiffs failed to state a claim upon which relief can be granted.  *Id.* at 1-3.  Plaintiffs responded to the government's motion to

dismiss on August 21, 2023, and the government replied on September 22, 2023.  Pls.' Resp., ECF No. 12; Def.'s Reply in Supp. of its Mot. to Dismiss ("Def.'s Reply"), ECF No. 19.[1]  The motion is ready for disposition.

## BACKGROUND[2]

The property giving rise to the indemnification claim at issue is located on the Hunters Point Naval Shipyard ("the Shipyard") in San Francisco.  Compl. ¶ 20.  This suit implicates multiple statutes and congressionally authorized processes involved in the closure, environmental remediation, and transfer of this property.  First, the Shipyard was purchased in 1939 and used by the Navy until it was ultimately closed in 1991 pursuant to the Base Realignment and Closure process.  Compl. ¶¶ 21-22.  Second, prior to its closure, the entire Shipyard was designated as a site containing hazardous substances, pollutants, or contaminants under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA").  Def.'s Mot. to Dismiss App. at 26.  As a result of this designation, the government assured plaintiffs that necessary remedial action had been completed on the at-issue parcel before it was conveyed to plaintiff HPS Development.  Compl. ¶ 6.  Third, and at issue here, Section 330 governs whether plaintiffs are entitled to indemnification from the suit alleging that exposure to hazardous substances in the Shipyard caused personal injuries.

### A. Relevant Statutes

1. *Relevant statutes and congressionally authorized processes.*

   (i.)   The Base Realignment and Closure ("BRAC") Process.

This suit implicates multiple statutes and congressionally authorized processes.  First, Base Realignment and Closure ("BRAC") is a congressionally authorized process to close, clean, and repurpose former military bases, including for private development.  *See* Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, Title XXIX (1990).  As part of the BRAC process, a commission recommends United States military sites for closure and reuse.  *Id.* § 2903(d).  Moreover, the government allocates funds for and conducts environmental clean-ups at BRAC sites.  *See id.* 2905; Dep't of Def., *DoD Base Realignment and Closure* at 2 (2022), https://comptroller.defense.gov/Portals/45/Documents/defbudget/fy2023/budget_justification/pdf

---

[1] The government moved for leave to file a brief exceeding the page limit set by this court's rules on September 22, 2023, and attached its reply brief as an exhibit.  *See* Def.'s Mot. for Leave to File Reply in Supp. of Mot. to Dismiss Exceeding the Page Limit in RCFC 5.4(b)(2), ECF No. 17.  The court granted the motion, and, at the court's request, the government refiled its reply as a separate docket entry, ECF No. 19.

[2] The recitations that follow do not constitute findings of fact but rather are recitals attendant to the pending motion and reflect matters drawn from the complaint, the parties' motion and briefs, and documents attached to the motion and briefs.  For example, the government attached a consecutively paginated appendix to its motion to dismiss.  *See generally* Def.'s Mot. to Dismiss App., ECF Nos. 9-1 to 9-2.

s/05_BRAC/FY2023_BRAC_Overview.pdf (last visited Nov. 8, 2023); *see generally* EPA, *Base Reuse Process Overview*, https://www.epa.gov/fedfac/base-reuse-process-overview (last visited Nov. 8, 2023) (providing a timeline of the base reuse process).

        (ii.)     The Comprehensive Environmental Response Compensation and Liability Act ("CERCLA").

Relatedly, the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. ch. 103 (1980), governs environmental remediation of inactive hazardous-waste sites.[3] Section 9620(h) of CERCLA governs property that the federal government owns and transfers or sells to another party, including former military bases. It states that the government must provide notice prior to transfer or sale of any property "on which any hazardous substance was stored for one year or more, known to have been released, or disposed of." 42 U.S.C. § 9620(h)(1). In addition, section 9620(h)(3) dictates assurances that the federal government must give to the transferee or buyer of the property in a deed, including "a covenant warranting that . . . all remedial action necessary to protect human health and the environment with respect to any such substance remaining on the property has been taken before the date of such transfer," and that "any additional remedial action found to be necessary after the date of such transfer shall be conducted by the United States." 42 U.S.C. § 9620(h)(3)(A).[4]

        (iii.)    Section 330 of the National Defense Authorization Act for Fiscal Year 1993.

Section 330 protects and limits liability faced by buyers and transferees of land made available through the BRAC process, including former military bases. It enables buyers or transferees to rely on assurances from the government about the environmental safety of the property.

Section 330(a)(1) states:

> [T]he Secretary of Defense shall hold harmless, defend, and indemnify in full the persons and entities described in paragraph (2) from and against any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for

---

[3] Congress enacted CERCLA "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1500 (6th Cir. 1989) (quoting H.R. Rep. No. 96-1016, pt. 1, at 22 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6125).

[4] For properties available under BRAC and which are environmentally suitable for transfer or sale under CERCLA, the government must document the notice and assurances of environmental suitability that are required under 42 U.S.C. § 9620(h)(1), (3). *See* Dep't of Def., *DoD Base Ruse Implementation Manual* § 2.3 (1997). Accordingly, before transferring or selling a former military site affiliated with a hazardous substance, the government must issue a Finding of Suitability for Transfer ("FOST") for each parcel of land indicating that it is environmentally suitable for transfer. *Id.* § 2.1.3.

personal injury or property damage . . . that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance or pollutant or contaminant as a result of Department of Defense activities at any military installation (or portion thereof) that is closed pursuant to a base closure law.

Section 330(a)(2) specifies the persons and entities protected under 330(a)(1):

(A) Any State (including any officer, agent, or employee of the State) that acquires ownership or control of any facility at a military installation (or any portion thereof) described in paragraph (1).
(B) Any political subdivision of a State (including any officer, agent, or employee of the State) that acquires such ownership or control.
(C) Any other person or entity that acquires such ownership and control.
(D) Any successor, assignee, transferee, lender, or lessee of a person or entity described in subparagraphs (A) through (C).

Accordingly, the right to indemnification under Section 330 extends to any persons or entities that acquire ownership or control of a facility on a military installation closed under a base closure law. § 330(a).

Section 330 incorporates CERCLA's definition of "facility." § 300(f)(1). Under CERCLA, "[t]he term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9); § 330(f)(1).

Section 330(b) lists conditions that persons or entities protected under Section 330 must follow to make a claim for indemnification. They must (1) either notify the Department of Defense ("DoD") "in writing within two years after such claim accrues or begin[] action within six months after the date" that the DoD's "notice of final denial of the claim" is mailed; (2) "furnish[] to [DoD] copies of pertinent papers [they] receive[]; (3) furnish[] evidence or proof of any claim, loss, or damage covered by this section; and (4) provide[], upon request by [DoD], access to the records and personnel of the entity for purposes of defending or settling the claim or action." § 330(b).

### B. Redevelopment of the Former Shipyard

1. Navy Closes Hunters Point Naval Shipyard pursuant to BRAC.

The Hunters Point Naval Shipyard ("the Shipyard") consists of approximately 936 acres in San Francisco. Compl. ¶ 20. In 1939, the United States Department of the Navy ("the Navy") purchased the property for a naval base. Compl. ¶ 21. The Navy repaired and maintained ships and conducted radiological research at the Shipyard. Compl. ¶ 21. Between 1939 and the 1960s,

4

the Navy's operations on the Shipyard contaminated the soil, groundwater, surface water, and bay sediment. Compl. ¶ 21; Def.'s Mot. to Dismiss App. at 19.

In 1974, the Navy deactivated the Shipyard, and from 1976 to 1986, the Navy leased most of the property to a ship repair company. Compl. ¶ 22. In 1989, the Environmental Protection Agency ("EPA") evaluated the Shipyard and because of concerns related to past hazardous wastes, placed it on the Superfund National Priorities List. Def.'s Mot. to Dismiss App. at 26. The National Priorities List is a list of sites with known releases of hazardous substances, pollutants, or contaminants. Env't Prot. Agency, *Superfund: National Priorities List (NPL)*, https://www.epa.gov/superfund/superfund-national-priorities-list-npl (last visited Nov. 8, 2023).

In 1991, the Navy closed the Shipyard pursuant to the BRAC process and entered the CERCLA program to cleanup past hazardous waste. Compl. ¶ 22; Def.'s Mot. to Dismiss App. at 26. As part of the BRAC process, the property was separated into parcels "A," "B," "C," "D," and "E." Compl. ¶ 23. Parcel A is central to the case at hand. *See* Compl. ¶¶ 30, 32; Def.'s Mot. to Dismiss App. at 1-2.

In 1994, the Navy, the City and County of San Francisco, and the City and County of San Francisco Redevelopment Agency ("SFRA") agreed to establish a process to convey the shipyard in phases from the Navy to the City and County of San Francisco, which would then redevelop it. Compl. ¶ 24. The process dictated that the Navy would complete an environmental remediation of each section of the property that it would convey and issue a Finding of Suitability to Transfer ("FOST") certifying that the property was environmentally suitable for transfer. Compl. ¶ 24.

   2. *Lennar/BVHP LLC Selected to Redevelop Hunters Point Naval Shipyard.*

In 1998, after approving a redevelopment plan for the property, SFRA sought bids from developers. Compl. ¶ 26. In 1999, SFRA selected Lennar/BVHP, LLC, a subsidiary of Lennar Corp., "as the master developer for the entire [s]hipyard."[5] *See* Compl. ¶ 26; Sec. & Exch. Comm'n, *List of Subsidiaries – Lennar Corporation and Subsidiaries*, https://www.sec.gov/Archives/edgar/data/920760/000093176303000421/dex21.htm (last visited Nov. 8, 2023) (listing Lennar-BVHP, LLC as a subsidiary of Lennar Corp.). In 2003, SFRA approved the plan for redevelopment and entered into an agreement with Lennar/BVHP LLC. Compl. ¶¶ 28-29.

Meanwhile, in 1999, "Parcel A was approved for unrestricted future use" and removed from the Superfund National Priorities List after the Navy followed CERCLA's processes and determined that "no hazardous substances were present" on Parcel A and "there was no risk to

---

[5] Defendant contends that Lennar Corp. has not directly stated that Lennar/BVHP LLP is a subsidiary of Lennar Corp. Instead, defendant points to plaintiffs' complaint in which they state that Lennar/BVHP LLP it is "a subsidiary of *Lennar*." Def.'s Mot. to Dismiss at 13 (quoting Compl. ¶ 26) (emphasis added).

human health and the environment at Parcel A."[6]  Def.'s Mot. to Dismiss App. at 26.  In 2004, the Navy issued an FOST for Parcel A, assuring that it met the environmental standards for transfer and then conveyed Parcel A to SFRA.  *See* Compl. ¶ 30.  The San Francisco Redevelopment Agency, in turn, conveyed most of its interest in Parcel A to Lennar/BVHP LLP in 2005.  Compl. ¶ 30; Def.'s Mot. to Dismiss App. at 469-89 (quitclaim deed conveying SFRA's right, title, and interest in and to the real property to Lennar/BVHP LLP in 2005).  Lennar/BVHP LLP then assigned its interest in Parcel A to HPS Development.  Compl. ¶ 30.[7]  HPS Development "currently owns portions of Parcel A and leases other portions of Parcel A from [SFRA]."  Def.'s Mot. to Dismiss App. at 1.

> 3. *Navy Hires Tetra Tech EC Inc. to Complete the Environmental Remediation of Sections of Hunters Point Naval Shipyard.*

From 2003 to 2014, the Navy contracted with the private company Tetra Tech EC Inc., a subsidiary of Tetra Tech Inc., to ensure that parcels of the Shipyard were environmentally safe before releasing them for redevelopment.  *See* Compl. ¶ 31; Def.'s Mot. to Dismiss App. at 22.  Tetra Tech EC Inc. was hired to test parcels for radiation and remediate any sections where radioactivity levels were above regulatory limits.  *See* Compl. ¶ 31; Def.'s Mot. to Dismiss App. at 22.  A different subsidiary of Tetra Tech Inc., Tetra Tech Foster Wheeler, surveyed a building on Parcel A "for radiological activity, [and] then demolished and removed the building."  Def.'s Mot. to Dismiss App. at 21.

According to the EPA, Tetra Tech EC Inc. "did not perform radiological work on Parcel A."  Def.'s Mot. to Dismiss App. at 21.  This was because the parcel had already been "approved

---

[6] "Cleanup of [Parcel A] included removal of former underground storage tanks, abatement of asbestos in buildings planned as leased space, and demolition of some structures."  Def.'s Mot. to Dismiss App. at 20, 26.  Historically, Parcel A was largely used for residential and administrative purposes.  *Id.* at 19.  The primary radiological concern that the Navy identified on Parcel A was related to three laboratory buildings, two of which contained a high-voltage accelerator laboratory and an x-ray facility.  *Id.* at 20.  Ultimately, the Navy investigated all three buildings, and they were cleared for unrestricted use.  *Id*.  One of the buildings was demolished and removed.  *Id*.  Later, on September 11, 2018, the California Department of Health found a "radium-containing naval deck marker" under "approximately 10 inches of soil."  *Id.* at 24.  The silver-dollar-size deck marker was unearthed and removed, after which radiation readings "showed no remaining contamination in the soil."  *Id.*

[7] The government contends that "Lennar Corp. has not demonstrated that it ever owned any property at the Shipyard; instead, material submitted by plaintiffs to [DoD], as part of their claim for defense and indemnification[,] shows that plaintiff HPS Development owned portions of one section of the Shipyard—Parcel A."  Def.'s Mot. to Dismiss at 2.  Defendant also attached quitclaim deeds showing that between 2012 and 2015, HPS Development then conveyed parts of its interest in Parcel A to SFRA.  Def.'s Mot. to Dismiss App. 490.

6

for unrestricted future use" in 1999 after it was "concluded that there was no risk to human health and the environment in Parcel A." *See id.* at 26.

   4. *Redevelopment of Hunters Point Naval Shipyard and Tetra Tech EC Inc.'s Forged Environmental Remediation.*

Between 2013 and 2018, plaintiffs built over 300 homes on Parcel A. Compl. ¶ 32.[8] In 2012, the Navy directed Tetra Tech EC Inc. to review and conduct additional cleanup at the Shipyard because of irregularities in soil confirmation samples collected by the company. Def.'s Mot. to Dismiss App. at 22. Because of additional concerns, in 2016 the Navy, EPA, and State of California investigated Tetra Tech EC Inc.'s radiological data and concluded that the company had potentially falsified or manipulated the data. *Id.*

By May 2018, criminal plea agreements in two lawsuits in the United States District Court for the Northern District of California revealed that Tetra Tech EC Inc. employees had falsified soil sampling data during the environmental remediation of the Shipyard. *See* Compl. ¶ 33; Plea Agreement ¶ 2, *United States v. Hubbard*, No. 17-cr-278 (N.D. Cal. May 18, 2017), ECF No. 8; Plea Agreement ¶ 2, *United States v. Rolfe*, No. 17-cr-123 (N.D. Cal. Mar. 15, 2017), ECF No. 7.[9] Subsequently, people who worked or lived near the property filed lawsuits alleging harm from Tetra Tech EC Co.'s failure to remediate the property. Compl. ¶ 34.

### C.  The Carter *Lawsuit*

On June 15, 2018, Richard Thomas Carter, Jr. and Juarinton De Stephano Carter filed a lawsuit against Tetra Tech EC Inc. connected to its failure to remediate the Shipyard. *See* Compl. ¶ 35; *Carter v. Tetra Tech EC, Inc.*, No. CGC-18-567302 (S.F. Cnty. Super. Ct., filed June 15, 2018).[10] The Carters were contractors and workers at the Shipyard between 2015 and 2017. Compl. ¶ 7, *Carter v. Tetra Tech EC, Inc.*, Case No. 4:19-cv-2555-JST (N.D. Cal. May 13, 2019), ECF No. 1-1 ("*Carter* Compl."). The Carters alleged that they were exposed to radioactive and toxic materials from the Navy's prior operations on the site because Tetra Tech EC Inc. failed to properly remediate it. *Carter* Compl. ¶¶ 10, 55-83; Compl. ¶ 56. The complaint alleged that this exposure to radioactive and toxic materials led to plaintiff Richard

---

[8] While plaintiffs state that they both built homes on Parcel A, the government alleges that only HPS Development could have built homes on Parcel A because by 2013, Lennar/BVHP LLP had already assigned its interest in Parcel A to HPS Development. *See* Def.'s Mot. to Dismiss at 13-14.

[9] "During 2012, I told [employees] on my team to get 'clean dirt' from areas known to be clean and taken from outside the marked survey unit areas to use as substitute samples for the dirt from the marked survey unit. I did this so that the survey unit would pass the laboratory analysis and not require further remediation." Plea Agreement ¶ 2, *Rolfe*, No. 17-cr-123.

[10] The suit was then removed to the United States District Court for the Northern District of California. Def.'s Mot. to Dismiss App. at 5.

Carter's cancer and plaintiff Juarinton De Stephano Carter's fear of contracting cancer and other illnesses.  Compl. ¶¶ 36-38.

The Carters also named Lennar Inc., (aka "Lennar Group," dba "Lennar Commercial" and also dba "Lennar Urban") and other entities as defendants.  *See Carter* Compl. ¶ 10.  Compl. ¶¶ 35-38.  Lennar Inc. is not a legal entity, but the Carters acknowledged that while they knew that the company's principal place of business was Miami, Florida, they did not know its "true and correct business form."  *Carter* Compl. ¶ 10; Def.'s Mot. to Dismiss at App. at 1 n.1.  The Carters stated their intent to seek leave to amend their complaint once they knew Lennar Inc.'s correct name.  *Carter* Compl. ¶ 10.

### D.  *Request for Indemnification*

On July 6, 2018, Lennar Corp. and HPS Development sent a letter notifying DoD of the *Carter* lawsuit and requesting that the government hold them harmless, defend them, and indemnify them under Section 330.  Compl. ¶ 39; Def.'s Mot. to Dismiss App. at 1-3.  The letter acknowledged that the co-defendant named in the *Carter* suit, Lennar Inc., was not a legal entity.  Def.'s Mot. to Dismiss App. at 1 n.1.  At the same time, the letter stated that "Lennar [Corp] and its affiliates are covered persons" entitled to indemnification under Section 330, "as they have acquired ownership and control of portions of the Shipyard (which is a former military installation, closed pursuant to base closure law) through their relationship with [SFRA] . . . . [and] [t]he claims against Lennar [Corp.] allege personal injury and property damage resulting from the Navy's releases of hazardous substances, pollutants, and contaminants through its activities at the Shipyard."  Def.'s Mot. to Dismiss App. at 3.

The Department of Defense confirmed receipt of plaintiffs' letter on August 7, 2018 and stated that it would "adjudicate any request for indemnification or defense by [ ] Lennar Corp[.]"  Compl. ¶ 40.  The Department of Defense informed plaintiffs that it would review plaintiffs' letter and the attached documents and that it would apprise Lennar Corp. and HPS Development if additional information was required.  Compl. ¶ 40.

Because DoD had not yet determined if it would defend or indemnify Lennar Corp. and HPS Development in the *Carter* suit, plaintiffs' counsel evaluated issues in and negotiated the dismissal of the case, thereby incurring legal fees and costs.  Compl. ¶ 41.  In 2019, a stipulation dismissing all claims against Lennar Inc. without prejudice was entered.  Compl. ¶ 41; Def.'s Mot. to Dismiss App. at 14-16.  The Carters stated that they were stipulating to Lennar Inc.'s dismissal because the entity "has no dominion, authority[,] or control over the supervision, funding, or clean-up of . . . Hunters Point."  Def.'s Mot. to Dismiss App. at 15.

### E.  *Department of Defense Denies Request for Indemnification*

Plaintiffs informed DoD of the stipulation dismissing all claims against Lennar Inc. in the *Carter* suit.  After DoD asked, plaintiffs informed DoD that they intended to submit their *Carter* defense costs.  Compl. ¶ 42.  On August 14, 2019, plaintiffs submitted $171,855 in attorneys' fees as defense costs.  Compl. ¶ 43.  DoD responded that it could not "provide the requested defense" and that it would determine the issue of indemnification after "the claims giving rise to

the requests accrue." Compl. ¶ 44. Plaintiffs continued to communicate with DoD. Compl. ¶ 45. On December 11, 2019, DoD requested more information related to plaintiffs' request for defense costs and indemnification, including time, and billings sheets, invoices, costs, and expenses. Compl. ¶ 46. On July 17, 2020, plaintiffs submitted the requested information, including responses to DoD's questions and ten exhibits to support their responses. Compl. ¶ 47. Plaintiffs decreased their requested reimbursement for the *Carter* litigation to $119,095.92, after excluding costs that were primarily related to other lawsuits. Compl. ¶ 47.

Two years later, on September 23, 2022, DoD denied plaintiffs' request for indemnification for defense costs incurred in the *Carter* litigation. Compl. ¶ 49. The Department of Defense denied plaintiffs' requests because it found that their billing entries did not contain sufficient detail to show that they were related to the *Carter* litigation. Compl. ¶ 50. It also stated that the amounts plaintiffs requested were not facially reasonable. Compl. ¶ 50. "For purposes of [that] adjudication, [DoD] assume[d], without deciding, that the Lennar entities are parties entitled to indemnification under Section 330." Compl. ¶ 50. Plaintiffs requested reconsideration on October 26, 2022, but DoD did not respond. Compl. ¶¶ 51-52.

### F.  Parties' Positions

Plaintiffs now seek judgment under Section 330 in the amount of $119,095.92, any additional amount provided for under Section 330, and interest on the judgment. Compl. ¶¶ 69-72. The government claims that the court does not have subject-matter jurisdiction and that plaintiffs have failed to establish standing or state a claim upon which relief can be granted. Def.'s Mot. at 1-3.

More specifically, the government contends that (1) neither plaintiff is a covered "entity" because HPS Development owns Parcel A but was not named in the suit and Lennar Corp. was named in the suit but does not own Parcel A; (2) that Parcel A neither contains nor is itself a covered "facility" because no hazardous substances have been found there; and (3) that the personal injuries the Carters claim cannot give rise to a Section 330 indemnification request because the Carters did not establish their injuries were caused by the threatened or actual release of a hazardous substance. *Id*. The government also levels a narrower challenge against plaintiffs' request for interest, arguing that Section 330 does not waive the government's sovereign immunity for claims of interest. *Id.* at 29.

## STANDARDS FOR DECISION

### A.  Rule 12(b)(1) — Lack of Subject-Matter Jurisdiction

The Tucker Act provides this court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act does not, however, provide substantive rights. *See United States v. Testan*, 424 U.S. 392, 398 (1976). To establish this court's jurisdiction under the Tucker Act, plaintiffs must "identify a substantive right for money damages against the United States separate from the Tucker Act."

*Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004).  Section 330(a) can provide such a substantive right.  *See Richmond Am. Homes of Colo., Inc. v. United States*, 75 Fed. Cl. 376, 385 (2007).  Plaintiffs must establish jurisdiction by a preponderance of the evidence.  *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).

Standing also is a jurisdictional issue.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998).  Plaintiffs "bear[] the burden of establishing that [they] ha[ve] standing."  *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).  "The Court of Federal Claims, though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III."  *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (internal citation omitted).  Article III standing enforces the Constitution's case-or-controversy requirement.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Prudential standing, on the other hand, looks to whether "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also McKinney v. United States Dep't of Treasury*, 799 F.2d 1544, 1550-51 (Fed. Cir. 1986).  It asks "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).

When ruling on the government's motion to dismiss for lack of subject-matter jurisdiction, the "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc.*, 695 F.3d at 1163 (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).  When the parties dispute alleged facts bearing upon jurisdiction, the court "may weigh relevant evidence."  *Labruzzo v. United States*, 144 Fed. Cl. 456, 470 (2019) (quoting *Mildenberger v. United States*, 643 F.3d 938, 944 (Fed. Cir. 2011)).[11]  "If a court lacks jurisdiction to decide the merits of a case, dismissal is required as a matter of law."  *Gray v. United States*, 69 Fed. Cl. 95, 98 (2005) (citing *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)); *see also Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985); Rule of the Court of Federal Claims ("RCFC") 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); RCFC 12(b)(1).

### B.  Rule 12(b)(6) — Failure to State a Claim

Under RCFC 12(b)(6), a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

---

[11] "If a defendant mounts a factual challenge to the facts upon which jurisdiction is premised [plaintiffs] may lose the benefit of the foregoing presumption of truth.  In such a situation, the court may look outside the complaint and receive evidence for the purpose of resolving the jurisdictional issue of fact."  *Morris v. United States*, 33 Fed. Cl. 733, 741-42 (1995).

10

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual matters alleged "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim upon which relief can be granted. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

## ANALYSIS

The parties' dispute centers on three limitations Section 330 imposes on the government's indemnification obligation: whether (A) Parcel A contains or is itself a covered "facility," (B) the personal injuries the Carters claim to have suffered were "caused or contributed to by the release or threatened release" of a hazardous substance, and (C) each plaintiff is a covered "entity." The government also contends that Section 330 does not waive sovereign immunity for claims of interest.

### A. The classification of Parcel A or any its buildings as a "facility"

Section 330 protects developers that own or control "any facility at a military installation (or any portion thereof)" from costs or fees arising out of personal injury claims that are "in any manner predicated upon" the actual or threatened release of hazardous substances as a result of DoD activities at the military installation. Section 330(f)(1) incorporates the definition of "facility" set forth in CERCLA, 42 U.S.C. § 9601(9): "(A) any building, structure, installation, equipment, pipe or pipeline . . . well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

According to defendant, a facility only meets Section 330's definition if it is "a site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." Def.'s Mot. to Dismiss at 23 (quoting 42 U.S.C. § 9601(9)). The government contends that "no hazardous substances have been found at Parcel A," and asks the court to take judicial notice of EPA, Navy, and California Department of Public Health statements to that effect. *Id.* at 24-26. Put differently, it is not enough that the Carters allege in their suit that hazardous materials were present on Parcel A or that hazardous materials have been found on other portions of the Shipyard—plaintiffs must allege that hazardous substances were in fact present on Parcel A for it to be a covered "facility." *Id.* at 23-24; Def.'s Reply at 14-18. The government argues that to hold otherwise would create the "absurd result" of extending indemnification to plaintiffs that own a portion of a military installation "even if that claim has no relationship at all to the plaintiff's portion and instead relates to a portion potentially miles away." Def.'s Reply at 16.

Plaintiffs advance a broader reading of facility than the government. First, plaintiffs argue that § 9601(9)(B) includes not only the portions of land where hazardous waste has been found, but the entire site, including portions of the property where hazardous waste has not been found. Pls.' Resp. at 21. In support of this argument, plaintiffs focus on the statutory language indemnifying entities that acquire "any facility at a military installation (or *any portion thereof*)." *Id.* at 21 (quoting Section 330(a)(2)). Under this reading, because neither party disputes that hazardous substances have been found at the Shipyard and Parcel A is within the Shipyard, the plaintiffs acquired a portion of a covered facility. Alternatively, plaintiffs argue that property they acquired on Parcel A satisfies § 9601(9)(A)'s definition of "facility" because Parcel A contained buildings and infrastructure when plaintiffs purchased it. *Id.* at 21-22; 42 U.S.C. § 9601(9). As another independent argument, plaintiffs contend that whether "hazardous substances were ever deposited or stored at Parcel A cannot be decided at the pleading stage" because it is "one of the central disputed issues of fact in the *Carter* suit." Pls.' Resp. at 22-23.

Section 330 does not require that hazardous materials actually be present for a property to constitute a facility. Instead, it requires, first, that the entity own a facility on a military installation closed pursuant to a base closure law and, second, that the cost for which the claimant seeks indemnification be "in any matter predicated on" threatened or actual exposure to hazardous substances as a result of DoD activities at the military installation.

Section 330(a)(2) establishes the first requirement that entities seeking indemnification must have "acquire[d] ownership or control of any facility at a military installation (or portion thereof) described in paragraph (1)," namely, those "closed pursuant to a base closure law." The remaining language in paragraph (1) pertains to the second requirement that the claim for which the entity seeks indemnification be "any suit, claim, demand or action, liability, judgment, cost or other fee arising out of any claim for personal injury or property damage . . . that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance." Accordingly, Section 330's text does not require that the facility the entity owns be located on the portion of the installation where DoD activities have caused the release or threatened release of hazardous material.

To read in such a requirement would run counter to the purpose of Section 330, i.e., to facilitate the redevelopment of closed bases. As stated by Senator John McCain promoting an earlier version of Section 330:

> The bill requires the Department of Defense to defend, hold harmless, and indemnify innocent receivers of the property against claims arising from pollution caused by military activities. This protection is absolutely critical if we are to promote the timely and efficient transmission of base property to new and productive uses . . . .
>
> We have a Federal obligation to help facilitate a safe and timely transfer of base property to other productive uses. We cannot possibly achieve that goal if those who would put that property to use must risk everything in the process.

>We must do what's right—ensure, without condition, that the Federal
>Government will defend and indemnify states and employers who are sued over
>pollution caused by Federal activities.

138 Cong. Rec. 25905-06 (1992); *cf. Indian Harbor Ins. Co. v. United States*, 704 F.3d 949, 957-58 (Fed. Cir. 2013) (finding these statements useful in confirming the Federal Circuit's "reading of the unambiguous plain language in Section 330"). Specifically, such a reading would create uncertainty for those acquiring property on closed military installations by conditioning indemnification on whether the entity purchases property containing hazardous substances or instead acquired adjacent portions of the installation devoid of hazardous substances. But claims based on government activity may cause such entities to incur costs regardless of whether said activity caused hazardous substances to be released on the purchased land or instead on an abutting parcel.

Indeed, the location of hazardous material can be difficult to determine with certainty. Accordingly, claims for personal injury based on exposure to hazardous substances do not always accurately track the location of hazardous substances. Relatedly, efforts to locate hazardous substances and remediate effected areas are not always entirely successful, development after conveyance may uncover previously undiscovered hazardous substances, and activities on adjacent parcels may relocate hazardous materials to an owner's parcel. So, the exact location of hazardous substances may not be known at the time the land is conveyed by the government or even at the time the third-party personal injury or property damage claim is made.

These difficulties in determining the precise location of hazardous materials make it so that such materials may not be discovered until years after conveyance. Such uncertainties also prompt plaintiffs to bring suits against all entities involved in developing every possibly effected parcel to determine whether and to what extent they were exposed to such materials. *See, e.g.*, *Carter* Compl. ¶¶ 9-17. These plaintiffs rely on discovery to learn the location of hazardous materials. Whether these underlying suits are resolved before discovery, as here, or after discovery, the entity sued will have incurred costs. Accordingly, indemnification would only incentivize the conveyance of such land if it applied to entities purchasing parcels with hazardous substances and nearby parcels without hazardous substances alike. After all, Section 330 grants indemnification not from only successful claims but from "any claim" predicated "in any manner" upon actual or threatened exposure to hazardous substances on decommissioned military installations.

Here, plaintiffs do not specifically allege that the portion of Parcel A they purchased contained buildings and attendant infrastructure, but plaintiffs do allege that the government conveyed "a majority of Parcel A" to "Lennar/BVHP, LLC" that then "assigned its interest in Parcel A to HPS Development." Compl. ¶ 30. They further claim that the Shipyard as a whole had "numerous support buildings." Compl. ¶ 21. The government does not contend that there were neither buildings nor other infrastructure on plaintiffs' portion of Parcel A. Instead, it observes plaintiffs' complaint does not allege that their portions of Parcel A contained buildings or infrastructure. Def.'s Rely at 19-20. Plaintiffs' allegations in the complaint support the inference that their portions of Parcel A contain a facility satisfying CERCLA's broad definition.

The Shipyard was designated as a Superfund site, and Parcel A was evaluated and approved for unrestricted future use and conveyed to HPS Development. Notwithstanding this approval, Parcel A's proximity to land on the same military installation undergoing remediation made plaintiffs targets for personal injury claims arising from exposure to hazardous materials. The *Carter* plaintiffs named Lennar because they believed it "controlled, operated, maintained, managed, owned, built and/or supervised the building, construction and/or improvements of and to" the Shipyard, and that plaintiffs caused the Carters' personal injuries by "failing to properly remediate and cleanup" the site. *Carter* Compl. ¶¶ 56-61.

Taken together, the *Carter* Complaint and Parcel A's location on the Shipyard are sufficient to raise plaintiffs' claim that Parcel A contains or is itself a covered facility beyond the speculative level. This is not an instance where the personal injury claims for which plaintiffs seek indemnification "has no relationship at all to the plaintiff[s'] portion and instead relates to a portion potentially miles away." Def.'s Reply at 16. Instead, the personal injury claim for which plaintiffs seek indemnification concerns the Shipyard as a whole, and portions of that Shipyard abutting Parcel A remain under remediation.

### B. Section 330's requirement that the underlying personal injury claim result from or be in any manner predicated on the release of hazardous substances

The second contested requirement of Section 330 is whether the *Carter* suit constitutes a "claim for personal injury . . . that results from, or is in any manner predicated upon, the release or threatened release of any hazardous substance . . . as a result of Department of Defense activities" at a covered military facility. Section 330(a)(1).

The government avers that "a personal injury claim that can form the basis of an indemnification claim must be caused or contributed to" by the release or threatened release of a hazardous substance. Def.'s Mot. to Dismiss at 28-29. In other words, it is not enough that the Carters merely allege that hazardous materials on Parcel A caused or contributed to their injuries—plaintiffs must allege that the Carters' injuries were in fact caused or exacerbated by the release or threatened release of hazardous substances on Parcel A. *Id.* The government relies on Section 330(d)'s accrual provisions, incorporated into Section 330(b)(1)'s notice requirement, in supporting this argument. *See id.* at 27-29; Def.'s Reply at 21-22. For the purposes of fixing the notice deadline, a claim accrues on "the date on which the plaintiff knew (or reasonably should have known) that the personal injury . . . referred to in subsection (a) was caused or contributed to by the release or threatened release of a hazardous substance." Section 330(d). Defendant reads this provision with Section 330(a) to require that the personal injury plaintiff successfully establish causation in the underlying claim. Def.'s Mot. to Dismiss at 28-29.

Plaintiffs again respond that the government's narrow reading is not supported by Section 330's text. Pls.' Resp. at 23-25. Plaintiffs focus on Section 330's provision of indemnification for lawsuits "'in any manner predicated upon' allegations of personal injury from exposure to hazardous substances" at a covered military installation. *Id.* at 24. This broad reading covers even claims for personal injury that are proven unmeritorious during litigation. *Id.* Plaintiffs argue that Section 330's goal of encouraging economic development of former military facilities would be undermined if its indemnification only extended to meritorious claims. *Id.*

14

Section 330(a)(1) does not require that the causal relationship between the presence of hazardous substances and the claimed injury be conceded or demonstrated in the underlying personal injury suit.  Indeed, it allows indemnification from "any claim for personal injury . . . in any manner predicated upon" the release of a hazardous substance, not just those claims that successfully establish causation.  Section 330(a)(1).  A claim is merely a "statement that something yet to be proved is true."  Claim, Black's Law Dictionary (11th ed. 2019).  Nowhere in the statute's text is a requirement that the claim in question successfully establish causation.

The government's attempt to locate such a requirement by reading subsections (a), (b), and (d) together fails.  Subsections (b) and (d) do not limit the scope of indemnification established in subsection (a)(1) to only claims where the personal injury plaintiff successfully establishes causation.  Indeed, the purpose of subsection (b)'s notification is to allow DoD the opportunity to decide whether it is obligated to provide indemnification and, if so, whether to defend or settle the claim or action.  Section 330(b).  Put differently, based on the information that must be disclosed, DoD can elect to settle strong claims or defend weaker or even non-meritorious ones.  Moreover, under subsection (b)(1), an entity seeking indemnification can proceed either by providing notice after the underlying personal injury claim accrues, or by "begin[ning] action within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the Department of Defense."  So even if the government's reading of the accrual provision is correct—*i.e.*, the notice portion of Subsection 330(b)(1) prohibits entities seeking indemnification from providing notice of personal injury suits that have failed to establish causation—an entity could nevertheless obtain indemnification from an unsuccessful personal injury claim under Section 330(a)(1) by beginning an action within six months of DoD's final denial.

Nonetheless, this court rejects the government's reading.  A covered entity may bring a Section 330 indemnification claim even if the plaintiff fails to establish causation in the underlying personal injury suit.  For the same reasons discussed *supra* at 12-13, Section 330 would fail to promote the development of closed military bases if it offered indemnification from only those claims that successfully demonstrate causation.

Accordingly, the Carters' allegation that plaintiffs caused the Carters' injuries by "failing to properly remediate and clean[ ]up" the Shipyard, *Carter* Compl. ¶ 56; *see also* Compl. ¶¶ 35-38, is sufficient to establish that plaintiffs have stated a claim for indemnification under Section 330 because the Carters' claim is predicated on the release of a hazardous substance as a result of DoD activities on a covered facility.  For the same reason, plaintiffs' indemnification claim is within this court's subject-matter jurisdiction.

### C. *Plaintiffs' status as "entities" eligible for indemnification*

Section 330 applies to "[a]ny . . . entity" that acquires "ownership or control" of "any facility at a military installation (or any portion thereof) described in paragraph (1)" and to "[a]ny successor, assignee, transferee, lender, or lessee" of such an entity. Section 330(a)(1)-(2). The government contends that neither plaintiff is an entity covered by Section 330. It argues Lennar Corp. is not covered because HPS Development, not Lennar Corp., owns Parcel A. It contends HPS Development's is not covered because it was not named in the Carters' personal injury suit. On these bases, the government challenges the sufficiency of plaintiffs' claims, plaintiffs' prudential standing,[12] and the court's subject-matter jurisdiction over plaintiffs' claims.

*1. Lennar Corp.'s status as a covered entity*

The government argues that "[o]nly persons or entities with . . . ownership or control" of property covered by Section 330 can be entitled to indemnification. Def.'s Mot. to Dismiss at 12. The quitclaim deeds appended to the government's motion do not show any portion of Parcel A was conveyed to Lennar Corp., and Mr. Hart's July 6, 2018, letter does not state that Lennar Corp. owns a portion of the parcel. *Id.* at 14; *see also* Def.'s Mot. to Dismiss App. at 1-4, 490-546. Moreover, Lennar Corp. cannot rely on its parent-subsidiary relationship with HPS Development because, despite this relationship, they are "distinct legal entit[ies]." Def.'s Mot. to Dismiss at 15. Lennar Corp. also cannot state a claim based on subrogation principles because Section 330 does not indemnify subrogees of property owners and, even if it did, Lennar Corp. provides no factual support that it was compelled to pay HPS Development's legal fees, a fact required to establish a subrogation relationship. Def.'s Reply at 1-2. On these grounds, the government argues Lennar Corp. should be dismissed from the action for failure to state a claim and to establish this court's subject-matter jurisdiction. *See* Def.'s Mot. to Dismiss at 16. For the same reasons, the government contends Lennar Corp. is not within Section 330's zone of interest for the purposes of prudential standing. *Id.* at 16-17.

Plaintiffs respond that Lennar Corp. is a proper plaintiff because, "as HPS [Development]'s corporate parent, it incurred defense costs arising from litigation related to alleged exposure at the [Shipyard] and is subrogated to HPS [Development's] rights." Pls.' Resp. at 7. Plaintiffs argue that this subrogation relationship renders Lennar Corp. a "successor, assignee, transferee, [or] lender" to HPS Development under Section 330. *Id.* at 9-10. Alternatively, plaintiffs contend that Lennar Corp. is a proper plaintiff because Section 330's indemnification of entities with "ownership or control" of a covered facility encompasses parent companies "whose subsidiaries are legal owners of record" of such facilities. *Id.* at 13. Next, plaintiffs contend that dismissing Lennar Corp.'s claims would undermine Section 330's purpose: to encourage private development of former military installations by limiting liability associated with environmental hazards caused by DoD activity. *Id.* at 8-9.

---

[12] The government initially argued HPS Development lacks either Article III or prudential standing. Def.'s Mot. to Dismiss at 21. It subsequently withdrew its argument that HPS Development lacks Article III standing. Def.'s Reply at 12.

16

Lennar Corp. is an "entity" under Section 330. The statute's text is broad, applying to "any entity" that acquires "ownership or control of any facility at a military installation," as well as "[a]ny successor, assignee, transferee, lender, or lessee" of such an entity. Section 330(a)(2). This list covers both an entity which seeks indemnification because it owns a facility on a military installation as well as an entity which seeks indemnification because it has been assigned or transferred a right or obligation in connection with such a facility. Section 330's text does not require that the interest assigned or transferred be an interest in the facility itself. It instead permits indemnification claims arising from the assignment or transfer of rights and obligations that, while somewhat removed from the land itself, could make the assignee or transferee a plausible defendant for a personal injury or property damage claim.

Subrogation is one vehicle by which rights and obligations are transferred or assigned. *See* Subrogation, *Black's Law Dictionary* (11th ed. 2019). It applies "where a party not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter." *First Nat'l City Bank v. United States*, 548 F.2d 928, 936 (Ct. Cl. 1977). HPS Development is an entity eligible for indemnification under Section 330 because it owns and leases portions of Parcel A that are located on a decommissioned military facility. *See* Def.'s Mot. to Dismiss App. at 490-96; *infra* at 19. The *Carter* litigation targeted Lennar Corp. and attempted to name it as a defendant based on their belief that it "controlled, operated, maintained, managed, owned, built and/or supervised the building, construction and/or improvements of and to" the Shipyard. *See Carter* Compl. ¶¶ 10, 59. Put differently, the *Carter* plaintiffs targeted Lennar Corp. because they mistakenly believed it, not HPS Development, owned Parcel A.

The government does not challenge the fact that Lennar Corp. incurred litigation expenses. *See generally* Def.'s Mot. to Dismiss. Instead, it contends Lennar Corp. was not compelled to pay legal fees associated with the *Carter* lawsuit. Def.'s Reply at 3-4. But Lennar Corp. incurred these legal fees because it was a target of the *Carter* lawsuit—while the *Carter* plaintiffs named Lennar Inc., they also indicated they would seek to amend their complaint once they ascertained "the true and correct business form of [Lennar Inc.]" *Carter* Compl. ¶ 10. Accordingly, Lennar Corp. had an interest in defending the *Carter* suit. "One who pays another's debt to protect his own rights and interests is not ordinarily considered a volunteer and may be subrogated to the creditor's rights." *First Nat'l City Bank*, 548 F.2d at 936. Lennar Corp. defended itself against the *Carter* suit to protect itself from liability for the Carters' claims. Put differently, Lennar Corp. incurred legal expenses to defend its interest in a personal injury claim predicated on alleged exposure to hazardous substances on land owned by HPS Development. In so doing, Lennar Corp. became HPS Development's subrogee.

As a matter of law, Section 330's text does not prohibit Lennar Corp. from asserting a claim for indemnification on the theory that, when it incurred costs as the target of the *Carter* litigation, both the obligation to pay those costs and the right to seek indemnification for those costs under Section 330 were transferred to it. This interpretation is supported by Federal Circuit precedent holding that an insurance company that incurred costs under a policy it issued to the development company owning the covered facility is an "entity" entitled to indemnification. *See Indian Harbor*, 704 F.3d at 956. In *Indian Harbor*, the government closed and conveyed a military installation to a city that then conveyed portions of the base to a developer. *Id.* at 951.

17

That developer obtained an insurance policy providing coverage for remediation expenses incurred while developing the property. *Id.* The developer later discovered hazardous substances and entered a voluntary cleanup agreement with state agencies. *Id.* at 951-52. As a result of this agreement, the developer incurred remediation costs that it submitted as claims under its insurance policy with Indian Harbor. *Id.* at 952. After this court dismissed Indian Harbor's claim for lack of subject-matter jurisdiction, the Federal Circuit reversed, explaining that "[n]othing in Section 330 . . . requires that the claimant itself suffer personal injury or own the damaged property." *Id.* at 956.

In *Indian Harbor*, the Federal Circuit rejected a reading of Section 330 that limits indemnification to only those entities that own the facility on a former military installation. Indian Harbor Insurance's claims are relevantly similar to Lennar Corp.'s. Indian Harbor Insurance bore costs associated with environmental remediation efforts on land owned by another entity because it issued a policy to the landowner. Lennar Corp. bore costs associated with a personal injury claim based on exposure to hazardous waste because Lennar Corp.'s subsidiary owns the land. Indian Harbor was entitled to indemnification even though it did not own the land and was not named in the claim between the state agencies and the landowner that gave rise to the remediation costs. Lennar Corp.'s claim is stronger because, even though it is not listed on the quitclaim deeds for Parcel A, it is the target of the *Carter* suit. That Lennar Corp. bears these expenses because of its subsidiary relationship rather than an insurance policy is inapposite. By defending the *Carter* plaintiffs' personal injury claim, Lennar Corp. became the equitable subrogee of HPS Development and stepped into its shoes for the purposes of Section 330 indemnification.[13]

Accordingly, Lennar Corp.'s allegations that it was harmed by DoD's "refusal to indemnify [it] for legal costs incurred as a result of lawsuits" targeting Lennar Corp. and predicated on the release of hazardous substances on a closed military base are sufficient, at this stage, to state a claim for relief under Section 330 and to establish Lennar Corp.'s standing and this court's subject-matter jurisdiction over Lennar Corp.'s claim. Compl. ¶ 16. Construing the complaint in a light most favorable to plaintiffs, Lennar Corp. has demonstrated it is a proper plaintiff with standing to sue under Section 330 as a transferee or assignee.

---

[13] The government attempts to analogize this case to *Fidelity and Guaranty Insurance Underwriters, Inc. v. United States*, where the Federal Circuit held the "Tucker Act's waiver of sovereign immunity" does not "extend[] to a general liability insurer seeking to sue as the equitable subrogee of a prime contractor." 805 F.3d 1082, 1088 (Fed. Cir. 2015). But that case concerned the Tucker Act's waiver of sovereign immunity over claims founded upon contracts with the United States. *See id.* at 1087. In that context, equitable subrogation constitutes a limited exception to the general rule that parties bringing claims founded on contracts with the government must be in privity with the government. *Id.* Here, Lennar Corp. asserts this court has jurisdiction based on Section 330, an Act of Congress. 28 U.S.C. § 1491(a); Compl. ¶ 17. Accordingly, *Indian Harbor* is the more persuasive authority.

### 2. *HPS Development's status as a covered entity*

Section 330(a)(1) requires the government to indemnify covered entities against "any suit, claim, demand or action, liability, judgment, cost or other fee arising out of" a covered third-party claim. In its motion to dismiss, the government challenges HPS Development's claims on the basis that it was not named in the underlying *Carter* suit.

The government reads Section 330 to apply only to "entities that were alleged to have caused the purported personal injury and were named as defendants." Def.'s Mot. to Dismiss at 19. Elsewhere, the government interprets Section 330 to require the entity seeking indemnification to have been subject to a claim or demand for costs arising from the underlying personal injury claim. Def.'s Reply at 9-10. Because HPS Development was not named as a defendant and did not receive a claim from Lennar Corp., the government avers it cannot seek indemnification. *Id*. Moreover, defendant contends that HPS Development cannot bootstrap its claim onto Lennar Corp.'s because they are distinct legal entities with different legal interests. *See* Def.'s Mot. to Dismiss at 21. Accordingly, the government contends HPS Development has failed to state a claim or to establish its standing or the court's subject-matter jurisdiction. *Id.* at 18-22.

In response, plaintiffs stress that "[c]ourts interpreting Section 330(a)(1) have repeatedly found that a party need not be sued to seek indemnification under Section 330." Pls.' Resp. at 16. Plaintiffs rely on *Indian Harbor*, 704 F.3d 949, arguing entities are entitled to indemnification even for costs incurred under regulatory agencies' voluntary compliance advisories rather than in connection with a civil suit, and even if the plaintiff is an insurer not named in the claim for personal injury or property damage. Pls.' Resp. at 16-18. Plaintiffs further aver that, even though HPS Development is not named in the *Carter* suit, it incurred legal costs because of the *Carter* suit and has standing as a subrogor to bring an action on behalf of costs incurred by its subrogee. *Id.* at 19-20.

HPS Development is an "entity" covered by Section 330 because it owns and leases portions of Parcel A. Def.'s Mot. to Dismiss App. 1, 490-97. Again, this reading is supported by Federal Circuit precedent. In *Indian Harbor*, the Federal Circuit's analysis identified as the Section 330 "claim for personal injury to property damage" not the claims the developer submitted to its insurer but the correspondence the developer received from state regulators demanding remediation. 704 F.3d at 952, 955-56. Although the *Indian Harbor* Court focused on whether a claim needs to be adversarial under Section 330, it reversed this court's dismissal of Indian Harbor's claim even though it was not the target of the state regulators' remediation demands. HPS Development is similarly situated insofar as it alleges it incurred costs as a result of a personal injury claim, even though it was not the express target of the claim. To require HPS Development to be subject to a claim by Lennar Corp. elevates form over substance. HPS Development and Lennar Corp. filed this lawsuit as co-plaintiffs, ensuring that plaintiffs will allocate any judgment awarded according to the costs each bore in defending the *Carter* suit.

Accordingly, at this stage of proceedings, HPS Development's allegations that it incurred costs in defending against the *Carter* lawsuit suffice to state a claim, establish its standing to sue under Section 330, and support this court's jurisdiction over it.

### *D. Interest*

Plaintiffs request $119,095.92 in costs incurred defending the *Carter* suit as well as interest on that amount.  Under the no interest rule "[i]nterest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."  28 U.S.C. § 2516(a).  The Tucker Act does not waive the government's sovereign immunity for claims of interest, *see* 28 U.S.C. § 1491; "the waiver for sovereign immunity for interest must be distinct from a general waiver of immunity for the cause of action resulting in the damages award against the United States," *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1126-27 (Fed. Cir. 2004).  Such a waiver must be "express" and "affirmative" and will be "strictly construed" in the government's favor.  *Id.* at 1127 (quoting *Libr. of Cong. v. Shaw*, 478 U.S. 310, 318 (1986)).

The government contends that the no interest rule bars plaintiffs' interest claim because Section 330 does not affirmatively and expressly waive immunity for interest.  Def.'s Mot. to Dismiss at 29-30.  Plaintiffs do not respond to the government's argument.  *See generally* Pls.' Resp.

Section 330's waiver for immunity for indemnification claims is broad.  It includes "any suit, claim, demand or action, liability, judgment, cost or other fee."  Section 330(a)(1).  Absent from that list, however, is an express and affirmative waiver of sovereign immunity for claims of interest.  Accordingly, this court lacks subject-matter jurisdiction over plaintiffs' claim for interest.

## CONCLUSION

For the reasons stated, the government's motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) is GRANTED in part and DENIED in part.  With respect to plaintiffs' claims for interest on the costs for which they seek indemnification, the government's motion to dismiss is GRANTED and plaintiffs' claim for interest is DISMISSED for lack of subject-matter jurisdiction.  With respect to plaintiffs' remaining claims, the government's motion to dismiss is DENIED.

It is so **ORDERED**.

s/ Charles F. Lettow  
Charles F. Lettow  
Senior Judge
