# In the United States Court of Federal Claims

<table>
<tr><td>

LENNAR CORPORATION

 and

HPS DEVELOPMENT CO., LP,

   Plaintiffs,

 v.

UNITED STATES OF AMERICA,

   Defendant.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

No. 23-416C<br>(Filed Under Seal: March 6, 2026<br>Reissued: April 6, 2026)[*]

</td></tr>
</table>

Geoffrey H. Yost, O'Melveny & Myers LLP, San Francisco, CA, with whom was Patrick Jones (admitted pro hac vice), O'Melveny & Myers LLP, Washington, DC, for Plaintiffs. Daniel M. Petrocelli, David Marroso, and Madhu Pocha (admitted pro hac vice), O'Melveny & Myers LLP, Los Angeles, CA, Of Counsel.

Amanda Tantum, Civil Division, U.S. Department of Justice, Washington, DC, with whom were Franklin E. White, Jr., Assistant Director, Patricia M. McCarthy, Director, and Yaakov M. Roth, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this action, Plaintiffs Lennar Corporation ("Lennar" or "Lennar Corp.") and its subsidiary, HPS Development Company, LP ("HPS"), claim entitlement to indemnification under Section 330 of the National Defense Authorization Act of 1993[1] for legal expenses paid to secure the dismissal of a lawsuit related to the presence of hazardous substances at a closed military installation. See Compl. ¶ 7, Carter v. Tetra Tech EC, Inc., Case No. 19-cv-2555 (N.D. Cal. May 13, 2019), ECF No. 1-1 [hereinafter Carter Compl.]. On June 22, 2023, the government

---

[*] This opinion was originally issued under seal, and the parties were given the opportunity to request redactions. The parties have not proposed any redactions. Therefore, the Court releases the opinion in full.

[1] Pub. L. No. 102-484, § 330, 106 Stat. 2315, 2371–73 (1992), amended by Pub. L. No. 103-160, Title X, § 1002, 107 Stat. 1745 (1993) (codified as amended at 10 U.S.C. § 2687 note) [hereinafter Section 330].

filed a Motion to Dismiss the Complaint in accordance with RCFC 12(b)(1) and 12(b)(6). Senior Judge Lettow, to whom this case was originally assigned, issued a detailed Opinion denying the Motion to Dismiss on November 8, 2023, except as to Plaintiffs' claim for interest, which he ruled not authorized under the Tucker Act.

The case is now before the undersigned on the parties' cross-motions for summary judgment. Pls.' Mot. for Summ. J., ECF No. 53 [hereinafter Pls.' Mot.]; Def.'s Cross-Mot. for Summ. J. & Resp., ECF No. 56 [hereinafter Def.'s Mot.]. For the reasons set forth below, the Court finds that because the material facts are not in dispute, and based on Judge Lettow's legal determinations, Plaintiffs Lennar and HPS are entitled to judgment as a matter of law.[2]

## FACTS NOT IN DISPUTE

The facts that form the background of this case are set forth in some detail in Judge Lettow's Opinion on the government's Motion to Dismiss. Lennar Corp. v. United States, 168 Fed. Cl. 334 (2023). For purposes of ruling on that Motion under RCFC 12(b)(6), Judge Lettow treated the allegations in the Complaint as true. Since then, Plaintiffs created a record in connection with their Motion for Summary Judgment that supports the factual allegations material to their claims. Except as set forth elsewhere in this Opinion, there is no genuine dispute as to any of the material facts upon which Judge Lettow relied at the motion-to-dismiss stage.

## I.    Hunters Point Shipyard Closure

The property giving rise to the indemnification claim at issue in this case is located at the former site of the Hunters Point Naval Shipyard in San Francisco, CA. Lennar Corp., 168 Fed. Cl. at 338 (citing Compl. ¶ 20, ECF No. 1). The Navy purchased the property in 1939. Id. (citing Compl. ¶¶ 21–22). In the decades that followed, the Navy repaired and maintained ships at the base and conducted radiological research. Id. at 340 (citing Compl. ¶ 21). These activities contaminated the Shipyard's soil, groundwater, surface water, and bay sediment. Id. (first citing Compl. ¶ 21; and then citing Def.'s App. to Mot. to Dismiss at 19, ECF No. 9-1).

---

[2] Plaintiffs have also moved for reconsideration of the Court's April 28, 2025 Order granting the government leave to amend its Answer to withdraw—without prejudice—its sole affirmative defense (i.e., insurance offset). See Pls.' Mot. for Recons. at 7–8, ECF No. 60. They ask the Court to vacate that Order and to rule on the merits of the withdrawn defense, citing alleged prejudice from litigation expenses, the desire for issue-preclusive effect in this and related Section 330 cases, and the government's asserted failure to comply with RCFC 7.3. Id. at 5–6.

Reconsideration under RCFC 59(a) is an extraordinary remedy available only to address an intervening change in controlling law, newly discovered evidence, or clear legal or factual error resulting in manifest injustice. Biery v. United States, 818 F.3d 704, 711 (Fed. Cir. 2016); Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004). Plaintiffs identify none of these circumstances, nor do the kinds of prejudice they assert constitute manifest injustice. Further, such a request for a merits ruling on a withdrawn defense seeks relief beyond the limited purpose of reconsideration. Plaintiffs' Motion for Reconsideration is therefore denied.

In 1989, the Environmental Protection Agency ("EPA") placed the property on the Superfund National Priorities List pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9605. Id. at 340 (citing Def.'s App. to Mot. to Dismiss at 26 (webpage describing the Navy's environmental remediation and transfer of Parcel A for residential redevelopment)). The Navy closed the Shipyard in 1991 pursuant to the Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, Title XXIX (1990) [hereinafter BRAC], which imposed "a congressionally authorized process to close, clean, and repurpose former military bases, including for private development." Lennar Corp., 168 Fed. Cl. at 338, 340.

Once operations at Hunters Point ceased, the Navy undertook an environmental investigation and effort to remediate contamination found at the Shipyard as required by CERCLA. Id. at 340 (first citing Compl. ¶ 22; and then citing Def.'s App. to Mot. to Dismiss at 26); see also id. at 338 (explaining CERCLA's federal-facility provisions, 42 U.S.C. § 9620, governing remediation of hazardous waste sites). In connection with the BRAC closure, the Navy subdivided the Shipyard into five Parcels designated "A," "B," "C," "D," and "E" and then conveyed them in phases to the City and County of San Francisco for redevelopment. Id. at 340 (first citing Compl. ¶¶ 23, 24, 30; and then citing Def.'s App. to Mot. to Dismiss at 1–2). Before transferring any parcel, the Navy was required to complete each subdivision's remediation and certify each parcel was environmentally suitable for transfer. Id. (citing Compl. ¶ 24).

## II.    Shipyard Redevelopment

In 1998, the San Francisco Redevelopment Agency ("SFRA") approved a redevelopment plan for the property. Id. (citing Compl. ¶ 26). The following year, SFRA selected Lennar/BVHP, LLC, a subsidiary of Plaintiff Lennar Corp., as the "master developer" for the Shipyard. Id. (citing Compl. ¶ 26). The Navy determined that "no hazardous substances were present" on Parcel A, and it was approved for unrestricted use. Id. (citing Def.'s App. to Mot. to Dismiss at 26).

Thereafter, in 2005, SFRA conveyed most of its interest in Parcel A to Lennar/BVHP. Id. at 341 (first citing Compl. ¶ 30; and then citing Def.'s App. to Mot. to Dismiss at 469–89). Lennar/BVHP then assigned its interest in Parcel A to Plaintiff HPS, which "currently owns portions of Parcel A and leases other portions of Parcel A from [SFRA]." Id. (citing Def.'s App. to Mot. to Dismiss at 1).

## III.    The Carter Lawsuit

Between 2003 and 2014, the Navy contracted with Tetra Tech EC, Inc. ("Tetra Tech") to complete remediation of the Shipyard's parcels before they were released for redevelopment. Id. (first citing Compl. ¶ 31; and then citing Def.'s App. to Mot. to Dismiss at 22). In 2012, after discovering irregularities in the soil confirmation samples collected by Tetra Tech, the Navy directed Tetra Tech to review and conduct additional clean up. Id. (citing Def's App. to Mot. to Dismiss at 22). The Navy, EPA, and the State of California subsequently investigated and concluded Tetra Tech "had potentially falsified or manipulated radiological data." Id. (citing Def.'s App. to Mot. to Dismiss at 22).

In the meantime, between 2013 and 2018, Plaintiff HPS built over 300 homes on Parcel A. Id. (citing Compl. ¶ 32). By May 2018, however, criminal plea agreements had been reached in two cases before the United States District Court for the Northern District of California, which "revealed that Tetra Tech . . . employees had falsified soil sampling data during the environmental remediation of the Shipyard." Id. (first citing Compl. ¶ 33; then citing Plea Agreement ¶ 2, United States v. Hubbard, No. 17-cr-278 (N.D. Cal. May 18, 2017), ECF No. 8; and then citing Plea Agreement ¶ 2, United States v. Rolfe, No. 17-cr-123 (N.D. Cal. Mar. 15, 2017), ECF No. 7).

After the criminal pleas were entered, several individuals who worked or lived near the Shipyard filed personal injury lawsuits alleging they had been harmed by Tetra Tech's falsifications and failures to remediate. Id. (citing Compl. ¶ 34). Among these was a suit filed by two contractor plaintiffs—the Carters—in Superior Court in San Francisco County. See Carter v. Tetra Tech EC, Inc., No. CGC-18-567302 (S.F. Cnty. Super. Ct., filed June 15, 2018).

Tetra Tech was the primary target of the Carter complaint. See Lennar Corp., 168 Fed. Cl. at 341–42. However, the Carter complaint also lodged claims against, among others, an entity identified as "Lennar, Inc., aka Lennar Group, dba Lennar Commercial and also dba Lennar Urban." Carter Compl. ¶ 10. The complaint explained that "Plaintiffs do not know the true and correct business form" of "Lennar, Inc." Id. And the complaint identified "Lennar, Inc." as among the entities that "controlled, operated, maintained, managed, owned, built and/or supervised" the redevelopment of the site. Carter Compl. ¶ 59.

"Lennar, Inc.," however, is not a legal entity. Lennar Corp., 168 Fed. Cl. at 342 (first citing Carter Compl. ¶ 10; and then citing Def.'s App to Mot. to Dismiss at 1 n.1). And Lennar Corp., one of the named plaintiffs in this suit, has never had an ownership interest in any part of the former Shipyard. Id. at 349. Rather, as noted above, HPS, which was not named in the Carter lawsuit, was the owner of Parcel A. Id.[3]

## IV.    Plaintiffs' Indemnification Requests

It is Lennar Corp.'s practice to retain counsel to defend itself and its subsidiaries when they are named as defendants in lawsuits. Sheaff Decl. ¶ 3, ECF No. 53-1. Consistent with that practice, Lennar Corp. hired two national law firms, Paul Hastings LLP and O'Melveny & Myers LLP, to represent both itself and HPS in connection with the Carter lawsuit. Id. ¶ 4.

On July 6, 2018, a few weeks after the Carter suit was filed, counsel sent a letter to the Department of Defense ("DoD") on behalf of both Lennar Corp. and HPS requesting that the government defend and indemnify them against the Carter lawsuit in accordance with Section 330(a)(1). Pls.' App. to Mot. for Summ. J. vol. II, at 118–21, ECF No. 53-4 [hereinafter Pls.'

---

[3] The Carter plaintiffs acknowledged in their complaint that they did not know the "true and correct business form" the entity they identified as "Lennar, Inc." but stated that they would amend their complaint once they obtained that information. Carter Compl. ¶ 10; Def.'s App. to Mot. to Dismiss at 1 n.1. No amendment was ever filed, however. Ultimately, counsel for Lennar Corp. and HPS negotiated a dismissal of the claims against "Lennar Inc." in 2019. Lennar Corp., 168 Fed. Cl. at 342.

App. vol. II] (Exhibit 12); <u>Lennar Corp.</u>, 168 Fed. Cl. at 342 (first citing Compl. ¶ 39; and then citing Def.'s App. to Mot. to Dismiss at 1–3). On August 14, 2019, Plaintiffs submitted their defense costs for the <u>Carter</u> action, totaling $171,855 in attorneys' fees. Pls.' App. vol. II, at 123 (Plaintiffs' August 14, 2019 letter to DoD seeking Section 330 defense costs (Exhibit 13)). DoD responded the same day, acknowledging that the request for indemnification was filed "within the limitations period prescribed by section 330 and 32 C.F.R. § 175.6(b)." Pls.' App. to Mot. for Summ. J. vol. I, at 81–82, ECF No. 53-3 [hereinafter Pls.' App. vol. I] (DoD August 14, 2019 letter acknowledging receipt of Plaintiffs' request for Section 330 defense costs (Exhibit 2)). DoD further advised it "c[ould not] provide the requested defense" and would "reserve[] a final decision on such requests [for indemnification] until the claims giving rise to the requests accrue." <u>Id.</u> at 82.

Over the next year and a half, Plaintiffs responded to a series of requests for more information from DoD and submitted documentation of the fees they had incurred. <u>Lennar Corp.</u>, 168 Fed. Cl. at 342–43 (citing Compl. ¶¶ 46–47). They also reduced their requested attorneys' fees to $119,095.92, excluding some costs that were at least in part related to other Section 330 lawsuits. <u>Id.</u> at 343 (citing Compl. ¶ 47); Pls.' App. vol. II, at 141–42 (Plaintiffs' July 17, 2020 letter to DoD requesting Section 330 indemnification (Exhibit 16)).

DoD ultimately denied the request for indemnification in its entirety in 2022. Pls.' App. vol. I at 94–100 (DoD September 23, 2022 letter denying Plaintiffs' request for defense costs (Exhibit 7)); <u>see</u> <u>Lennar Corp.</u>, 168 Fed. Cl. at 343 (citing Compl. ¶ 49). It "assume[d] without deciding that the Lennar entities are parties entitled to indemnification under Section 330." Pls.' App. vol. I at 97. Nonetheless, it found Lennar had not established that all of the work that documented and described in counsel's billing statements was related to the defense of the <u>Carter</u> lawsuit. <u>Id.</u> 97–98; <u>see</u> <u>Lennar Corp.</u>, 168 Fed. Cl. at 343 (citing Compl. ¶ 50). DoD was also of the view that the overall number of hours billed was excessive and unreasonable given that the case against "Lennar, Inc." was dismissed both before an answer to the complaint was filed and before counsel entered an appearance on its behalf. Pls.' App. vol. I at 100; <u>see</u> <u>Lennar Corp.</u>, 168 Fed. Cl. at 343 (Compl. ¶ 50).

## V.    Prior Proceedings on the Government's Motion to Dismiss

As noted above, when this case was before Judge Lettow, the government moved for its dismissal under RCFC 12(b)(1) and 12(b)(6). Mot. to Dismiss, ECF No. 9. Among other things, the government argued that neither Lennar nor HPS qualified as covered entities under Section 330, that Parcel A was not a covered facility under the statute, and that the injuries alleged in the <u>Carter</u> lawsuit did not give rise to a claim for personal injury or property damage within the meaning of Section 330. <u>See</u> <u>Lennar Corp.</u>, 168 Fed. Cl. at 343 (citing Def.'s Mot. to Dismiss at 1–3). It also argued more narrowly that the court lacked jurisdiction to assess interest on any amounts due Plaintiffs as indemnification because Section 330 does not expressly waive sovereign immunity for interest. <u>Id.</u> (citing Def.'s Mot. to Dismiss at 29).

In his November 8, 2023 Opinion, Judge Lettow largely denied the government's Motion to Dismiss. Id. at 352.[4] Judge Lettow found that Plaintiffs plausibly alleged Parcel A qualified as a covered facility and that the Carter lawsuit constituted a "claim" predicated upon the release or threatened release of hazardous substances at a closed military installation. Id. at 346–48. Finally, Judge Lettow concluded that the facts alleged by Plaintiffs established their entitlement to indemnification based on Lennar's status as HPS's equitable subrogee; a status Lennar obtained when—to protect their own interests—Lennar paid the legal bills of counsel that secured the dismissal of the Carter lawsuit. Id. at 350.

On October 1, 2024, the case was reassigned to the undersigned for all further proceedings. See ECF No. 32. Discovery has since closed, and the parties' cross-motions for summary judgment are now before the Court. See Pls.' Mot.; Def.'s Mot.; Pls.' Reply & Resp., ECF No. 61 [hereinafter Pls.' Reply]; Def.'s Reply, ECF No. 65. Oral argument was held on the motions on January 28, 2026.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations[] but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248).

In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Further, the court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255 (citing Kennedy v. Silas Mason Co., 334 U. S. 249 (1948)).

### II.    Lennar's Entitlement to Indemnification

The government acknowledges Judge Lettow's finding that the Carter plaintiffs' allegation that Lennar caused their injuries by "failing to properly remediate and clean[]up" the Shipyard constitute "covered claim[s]." Lennar Corp., 168 Fed. Cl. at 348 (alteration in original) (first citing Carter Compl. ¶ 56; and then citing Compl. ¶¶ 35–38); see Def.'s Mot. at 15; Pls.'

---

[4] As noted above, Judge Lettow agreed with the government only as to Plaintiffs' claim for interest on amounts due them as indemnification. See Lennar Corp., 168 Fed. Cl. at 351–52.

Mot. at 17–18. Further, it does not contest Judge Lettow's finding that the portions of Parcel A at issue here qualify as a covered "facility" under Section 330. Def's Mot. at 15; Pls.' Mot. at 18–19; see Lennar Corp., 168 Fed. Cl. at 345–47.

Instead, the government focuses on whether Lennar Corp. is an "entity" covered by Section 330(a)(2). But its arguments contradict the legal conclusions Judge Lettow reached in denying the government's Motion to Dismiss. The Court declines to revisit those conclusions, which are the law of the case.

### A.    Judge Lettow's Analysis

Section 330(a)(2) states that the individuals and entities entitled to indemnification include both those that acquire "ownership or control" of "any facility at a military installation (or any portion thereof)" and "[a]ny successor, assignee, transferee, lender, or lessee" of such an entity. Section 330(a)(2)(A), (C), & (D). At the motion-to-dismiss stage, Judge Lettow ruled that while Lennar had no ownership interests in any part of the base, it was nonetheless a covered entity entitled to indemnification under Section 330(a)(2) by virtue of its status as HPS's subrogee. Lennar Corp., 168 Fed. Cl. at 348–351.

To reach this conclusion, Judge Lettow relied upon the statute's "broad" text, noting that it "covers both an entity which seeks indemnification because it owns a facility on a military installation as well as an entity which seeks indemnification because it has been assigned or transferred a right or obligation in connection with such a facility." Id. at 349. As Judge Lettow explained, "[s]ubrogation is one vehicle by which rights and obligations are transferred or assigned." See id. (citing Subrogation, Black's Law Dictionary (11th ed. 2019)). "It applies where a party not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter." Id. (quoting First Nat'l City Bank v. United States, 548 F.2d 928, 936 (Ct. Cl. 1977)). "In such circumstances, the subrogee 'stands in the place' of the original creditor and obtains equivalent but no greater rights against the debtor than held by the original creditor." First Nat'l, 548 F.2d at 369 (quoting United States v. Munsey Trust Co., 332 U.S. 234, 242 (1947)).

Judge Lettow observed that "[o]ne who pays another's debt to protect his own rights and interests is not ordinarily considered a volunteer and may be subrogated to the creditor's rights." Lennar Corp., 168 Fed. Cl. at 349–50 (quoting First Nat'l, 548 F.2d at 936). In other words, "subrogation will be applied in favor of parties who act to protect their own interests." First Nat'l, 548 F.2d at 936.

In this case, Judge Lettow recognized that HPS is covered entity because it owns and leases portions of Parcel A. Lennar Corp., 168 Fed. Cl. at 351. Here, it is not disputed that the alleged injuries arose from conditions on land owned by HPS. That the Carters did not formally name HPS does not change the fact that HPS, as the owner of the covered facility, was the target of their lawsuit. See Indian Harbor Ins. Co. v. United States, 704 F.3d 949, 952, 955–56 (Fed. Cir. 2013) (identifying a Section 330 claim by the liability giving rise to incurred costs, rather than the identity of the target of the underlying third-party claim). Further, there can be no genuine dispute regarding the fact, evident on the face of the complaint in the Carter lawsuit, that

7

the Carter plaintiffs targeted "Lennar, Inc." and attempted to name it as a defendant based on the belief that Lennar Corp. "controlled, operated, maintained, managed, owned, built and/or supervised the building, construction and/or improvements of and to" the Shipyard." See Carter Compl. ¶¶ 10, 59).

The Carter plaintiffs, of course, were mistaken regarding Lennar's ownership interests. Lennar had no ownership interests or control over Parcel A. Even so, Judge Lettow reasoned that Lennar and HPS were placed in legal jeopardy by the Carter suit. See Lennar Corp., 168 Fed. Cl. at 349. Lennar's self-interest dictated that it hire counsel to defend itself and its subsidiary HPS against the lawsuit. See id. And by doing so, Judge Lettow concluded, Lennar took on HPS's obligation and became its subrogee. See id. at 349–50 (quoting First Nat'l, 548 F.2d at 936).

In short, Judge Lettow found that "Lennar Corp. defended itself against the Carter suit to protect itself from liability for the Carters' claims." Id. at 349. This fact is not in dispute. Nor is it disputed that "Lennar Corp. incurred legal expenses to defend its interest in a personal injury claim predicated on alleged exposure to hazardous substances on land owned by HPS." Id. at 350. And based on these undisputed facts, Judge Lettow held as a matter of law that "Lennar Corp. became HPS's subrogee." Id.

### B.        The Government's Arguments

In its Motion for Summary Judgment, the government invites the Court to revisit Judge Lettow's legal conclusions regarding Lennar's status as a subrogee. Indeed, the government contends that Plaintiffs' arguments on summary judgment, which track Judge Lettow's reasoning, "mangle the concept of equitable subrogation." Def.'s Mot. at 16. For example, the government contends that even if Lennar paid legal expenses that HPS rightfully should have paid, subrogation principles would only entitle Lennar to assert its legal counsel's rights to payment against HPS—not HPS's rights to indemnification under Section 330. Id. at 16–20. The government further argues Lennar acted as a volunteer when it paid the fees, making it ineligible for subrogation. Id. at 22–23.

To the extent that the government urges the Court to depart from Judge Lettow's legal analysis, the Court declines to do so. Judge Lettow conducted a thorough review of the parties' arguments and provided a reasoned explanation for his determination that Lennar was a covered entity by virtue of its status as HPS's equitable subrogee. Further, while he applied his legal analysis to the facts as alleged in the Complaint, the facts he assumed to be true do not differ in any material respect from those for which Plaintiffs have now provided support on summary judgment. See Equal Rights Ctr. v. Equity Residential, 798 F. Supp. 2d 707, 721 (D. Md. 2011) (explaining that denial of dismissal is dispositive at summary judgment if "factual showing[s] were essentially congruent with the factual allegations made in the complaint").

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983) (citing 1B Moore's Federal Practice ¶ 0.404 (2d ed. 1980)). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988) (quoting 1B Moore's Federal Practice ¶ 0.404 (2d ed. 1984)).

8

To be sure, absent a ruling by an appellate court, the law of the case doctrine "directs a court's discretion, it does not limit the tribunal's power." Arizona, 460 U.S. at 618. Nonetheless, the doctrine generally counsels against revisiting an issue previously decided in the same litigation unless there is: (1) an intervening change in controlling law; (2) newly available evidence; or (3) a need to correct clear error or prevent manifest injustice. Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649, 657 (Fed. Cir. 1985); see also Etchegoinberry v. United States, 132 F.4th 1374, 1378 (Fed. Cir. 2025) (emphasizing that courts "should exercise discretion in reopening matters already decided, absent extraordinary circumstances" (citing Christianson, 486 U.S. at 817)). None of those circumstances are present here.

For these reasons, and because there is no genuine dispute as to the facts material to whether Lennar was HPS's subrogee, the Court finds that, as a matter of law, Plaintiffs are entitled to indemnification for expenses they incurred to defend themselves against the Carter lawsuit, including reasonable attorneys' fees.

## III.    Reasonableness of Plaintiffs' Attorneys' Fees

Section 330 obligates the Secretary of Defense to "indemnify in full" covered entities "from and against" any "cost or other fee" arising out of a covered claim. § 330(a)(1). That broad language encompasses the reasonable attorneys' fees incurred in defending against covered third-party claims. See Richmond Am. Homes, Inc. v. United States, 80 Fed. Cl. 656, 670 (2008) (explaining fees incurred in responding to or defending against contamination-related claims are compensable under Section 330's "broad category" of out-of-pocket expenses).

Plaintiffs seek $119,095.92 in indemnification to compensate them for legal work performed for them by Paul Hastings and O'Melveny & Myers in connection with the Carter lawsuit. Compl. ¶ 70; Pls.' App. vol. II, at 143–65 (Paul Hasting billing entries (Exhibit 17); O'Melveny & Myers billing entries (Exhibit 18)). The government argues the Court cannot decide the reasonableness of Plaintiffs' fees without a trial and certain billing entries are not recoverable because they do not "aris[e] out of" the Carter litigation. Def.'s Mot. at 30–31. These arguments are unpersuasive.

As an initial matter, the government's categorical assertion that fee reasonableness "can only be resolved at trial," Def.'s Mot. at 30 (citing Feldman v. Talon Paint Prods., Inc., 2002 WL 31385826, at *7 (S.D.N.Y. Oct. 22, 2002)), lacks merit. Whether requested litigation costs are reasonable is routinely resolved on summary judgment where, as here, the record contains detailed contemporaneous billing records and declarations explaining the work performed and the basis for allocation. See, e.g., Tolliver Grp., Inc. v. United States, 161 Fed. Cl. 324, 333 (2022) (finding requested attorneys' fees reasonable on summary judgment); BASR P'ship v. United States, 130 Fed. Cl. 286, 309 (2017) (citing Wagner v. Shinseki, 640 F.3d 1255, 1261 (Fed. Cir. 2011)) (recognizing the court's discretion in determining whether litigation costs are reasonable), aff'd, 915 F.3d 771 (Fed. Cir. 2019). Plaintiffs produced the kind of documentation that permits the Court to make that determination now. See Pls.' App. vol. II, at 143–65 (billing entries); id. at 209–17 (Hart Declaration (Exhibit 24)).

Nor does this case involve the sort of credibility disputes or billing irregularities that led the court in Feldman to defer resolution until trial. See 2002 WL 31385826, at *7 (noting

allegations of plainly suspect billing practices). Here, the government's objections are narrow and entry-specific. Plaintiffs represent—and the government does not meaningfully contest—that the government challenges only a limited set of Paul Hastings entries totaling just over $10,000. Pls.' Reply at 16 n.16; see generally Def.'s Reply (not disputing Plaintiffs' characterization of the challenged entries).

The Court finds the contemporaneous billing entries supplied by Plaintiffs are sufficient to establish the reasonableness of the fees paid. They contain detailed descriptions of the work performed and identify the Carter matter. Pls.' Mot. at 25–26 (citing Pls.' App. vol. II, at 144 (Paul Hastings billing entries (Exhibit 17)); Id. at 164–65 (citing O'Melveny & Myers billing entries (Exhibit 18)). Plaintiffs also reduced their request by more than $50,000 to exclude entries that were primarily attributable to other Shipyard-related matters, reflecting an effort to segregate Carter-related defense costs from work performed in connection with other Section 330 disputes. Pls.' Mot. at 6–7 (citing Pls.' App. vol. II, at 142). In addition, Plaintiffs submitted evidence explaining how work was allocated to the Carter lawsuit. Pls.' Mot. at 27 (citing Pls.' App. vol. II, at 209–17 (Hart Declaration (Exhibit 24))).

The record also reflects that Plaintiffs' counsel discounted their fees and apportioned certain work among matters, further reducing the amount sought. Pls.' Reply at 15 n.15 (citing Pls.' App. vol. II, at 142, 161, 165); id. at 16 n.16. And it is undisputed that Lennar paid the fees for which reimbursement is sought. Pls.' Mot. at 27 (first citing Pls.' App. vol. II, at 217 (Hart Declaration (Exhibit 24)); and then citing Sheaff Decl. ¶ 4). In this Court, "[f]ees incurred and paid by a client at an agreed rate are presumptively reasonable because 'in reaching agreement, lawyer and client have already considered and weighed all the relevant factors.'" Lost Tree Village Corp. v. United States, 135 Fed. Cl. 92, 96 (2017) (citation modified) (quoting Fla. Rock Indus., Inc. v. United States, 9 Cl. Ct. 285, 290 (1985)). The government offers no evidence that the rates charged by either firm were outside prevailing market rates, and it does not dispute the fees charged by O'Melveny & Myers at all. Def.'s Mot. at 30–31; Def.'s Reply at 15–16; Pls.' Reply at 15–16.

The government's remaining objections focus on a subset of Paul Hastings entries, including entries relating to disclosures, communications, and information requests that the government characterizes as unrelated to the Carter litigation. Def.'s Mot. at 31. But the statutory standard is whether the cost or fee "aris[es] out of" the covered claim. § 330(a)(1). Work undertaken because litigation has been filed—including routine litigation-driven disclosures and responsive communications—may "aris[e] out of" that litigation even if it does not take the form of a court filing or appearance. Plaintiffs have offered a reasonable explanation of this point, including with respect to entries the government criticizes as "disclosures to lenders." Pls.' Reply at 16 n.16 (quoting Def.'s Mot. at 31). The government, by contrast, has not supplied evidence demonstrating that these entries were unrelated to the Carter matter. Instead, it principally asserts that the relationship is not "apparent" from the face of the time entry. Def.'s Mot. at 31.

On this record, the Court is satisfied that Plaintiffs' billing submissions permit it to determine the reasonableness of the requested fees without further fact development. Plaintiffs have substantiated that the attorneys' fees sought were incurred in defense of a covered claim, were reasonably related to the Carter litigation, and reflect appropriate billing judgment. The government's objections do not raise a genuine dispute of material fact sufficient to preclude

summary judgment. Accordingly, the Court concludes Plaintiffs are entitled to recover the full amount of attorneys' fees sought.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Reconsideration, ECF No. 60, is **DENIED**. Plaintiffs' Motion for Summary Judgment, ECF No. 53, is **GRANTED**, and the government's Cross-Motion for Summary Judgment, ECF No. 56, is **DENIED**. The Clerk of Court is therefore directed to enter judgment in favor of Plaintiffs in the amount of $119,095.92.

**IT IS SO ORDERED.**

/s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

11